UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDRA WHITCOMBE,

                              Plaintiff,

                -against-

LANZA CORP., et al.,

                              Defendants.

**MEMORANDUM OPINION
AND ORDER**

20-CV-04835 (PMH)

PHILIP M. HALPERN, United States District Judge:

Alexandra Whitcombe ("Plaintiff") brings this employment discrimination action against her former employers: (1) Lanza Corp.; (2) Sign Design; (3) JC Awning; (4) Adaptive Signage (collectively, "the Corporate Defendants"); (5) Joseph Lanza ("Lanza"); and (6) Nicholas Pagnozzi ("Pagnozzi," and with the Corporate Defendants, "Defendants"). (Doc. 1, "Compl."). Plaintiff alleges, *inter alia*, violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., on the basis of her race, religion, and gender. (*Id*. ¶¶ 88-99).

Plaintiff filed this action on June 24, 2020. (*Id*.). The Court, on November 24, 2020, held a pre-motion conference by telephone to discuss Defendants' anticipated motion to dismiss. (Nov. 24, 2020 Min. Entry; *see also* Doc. 32; Doc. 33; Doc. 34; Doc. 35; Nov. 18, 2020 Ord.). The Court, at that conference, directed that: (1) Defendants "produce to Plaintiff records (i.e., summaries, redacted payroll records, etc.) sufficient to establish the number of Defendants' employees for purposes of Title VII jurisdiction;" and (2) "the parties shall confer . . . as to whether the Court has jurisdiction over this action." (Nov. 24, 2020 Min. Entry).

The Court held a second telephone conference on December 15, 2020. (Dec. 15, 2020 Min. Entry). During that appearance, the Court directed that Defendants produce: (1) "payroll tax documents provided to New York State that identify the names of Defendants' employees in 2019

and 2020" to Plaintiff by December 31, 2020; and (2) "a 30(b)(6) witness with knowledge of the number of Defendants' employees from 01/2019 to date" for a deposition before January 15, 2021. (*Id*.). That deposition was limited to "establishing the number of Defendants' employees." (*Id*.).

The Court held a third telephone conference on January 20, 2021. (Jan. 20, 2021 Min. Entry). The parties reported during that appearance that, notwithstanding the discovery permitted, they could not agree on whether the Corporate Defendants had fifteen or more employees (i.e., the minimum number required to trigger Title VII's protections). (*Id*.). The Court, consequently, granted Defendants "leave to move . . . under Federal Rule of Civil Procedure 12" and set a briefing schedule. (*Id*.). All motion papers were filed on March 3, 2021. (Doc. 44; Doc. 45; Doc. 46, "Def. Br."; Doc. 48; Doc. 49; Doc. 50; Doc. 51; Doc. 52; Doc. 54, "Opp. Br."; Doc. 55).[1]

For the reasons set forth below, Defendants' motion to dismiss is GRANTED.

## BACKGROUND

Plaintiff, a resident of the Bronx and a female of Jewish faith and ancestry, was employed as Lanza Corp.'s Operations and Logistics Manager in Port Chester, New York, from June 3, 2019 until her termination on August 29, 2019. (Compl. ¶¶ 5-7, 9, 13-14). Lanza promised Plaintiff that this position would be her "dream job," that she would "eventually" be promoted, and that she would receive a $5,000 raise in 2020. (*Id*. ¶ 17). Plaintiff insists, however, that the "dream" turned into a nightmare, as she was discriminated against and subjected to a hostile work environment because of her race, religion, and gender.

---

[1] The Court had anticipated that the parties would establish the number of employees for Title VII purposes so that Plaintiff would amend the Complaint as necessary and properly allege that one or more of the Corporate Defendants qualified as an "employer" as defined by Title VII. Given the opportunity to amend the Complaint—and Plaintiff's utter failure to do so on this critical issue—the Court granted Defendants' request to move to dismiss on that basis.

I.   Plaintiff's Interview

During Plaintiff's interview, on a date not provided, Lanza told Plaintiff, "I'm sure an attractive woman like yourself can easily get exactly what you want out of a man." (*Id*. ¶ 19). While Plaintiff "felt troubled and degraded by" the comment, she considered the opportunity "too good" to pass up and accepted the position. (*Id*. ¶ 20).

II.   Plaintiff's Employment

Plaintiff advises, generally, that her employment was marred with confusion because there was no onboarding process, no handbook, no documentation explaining pay or benefits, no human resources department, and she was never provided any information about—assuming they existed —policies governing discrimination or harassment. (*Id*. ¶¶ 22-25).

A.   Conduct Untethered to Gender, Race, or Religion

At some point during Plaintiff's tenure, Lanza charged her with supervising Victor Orozco ("Orozco")—an individual employed by Lanza Corp. for approximately twenty years. (*Id*. ¶¶ 29, 31). Orozco "verbally harass[ed] and intimate[d]" Plaintiff on a daily basis. (*Id*. ¶¶ 32-33). In one incident, Plaintiff called Orozco to ask when he would return to the office; when Orozco did return, "he screamed at [Plaintiff] in front of the staff . . . because she inquired about his whereabouts . . . ." (*Id*. ¶ 36). Plaintiff, on multiple occasions, tried to justify to Orozco why she needed to know where he was, but Orozco would respond with screaming and profanities. (*Id*. ¶ 37). Nobody reprimanded Orozco for this behavior. (*Id*. ¶ 38).

Plaintiff had similar interactions with Jamie Orozco ("Jamie").[2] On one occasion, when Plaintiff asked Jamie where he had been earlier in the day, Jamie responded, "F[---] you[,] Alex!

---

[2] Plaintiff does not allege, but the Court infers, that some type of familial relationship existed between Orozco and Jaime.

You're not my boss! I don't have to answer to you!" (*Id*. ¶ 56). Plaintiff would regularly take calls for Jaime, but the latter refused to acknowledge her. (*Id*. ¶ 57).

Apart from her own interactions with Orozco, Plaintiff was present when Orozco engaged in "a particularly bad verbal altercation . . . [with] a new employee named Bryan" on Thursday, July 11, 2019. (*Id*. ¶ 39). That interaction was so vitriolic that Plaintiff was afraid the men would come to blows. (*See id*. ¶¶ 39-40). After leaving work that day, Plaintiff was so ridden with anxiety about what she had seen—and what would be waiting for her at the office the next day—that she was unable to sleep. (*Id*. ¶ 40). Although she went to work the following day, Friday, July 12, 2019, she left early "because she was shaken up by the previous days [sic] hostilities and became tired and sick from the outburst." (*Id*. ¶ 42). Plaintiff, before leaving, asked Jamie to "cover her responsibilities so she could go home two hours early." (*Id*.). Again, nobody "addressed" what transpired between Orozco and Bryan. (*Id*. ¶ 41).

When Plaintiff arrived at Lanza Corp. the next workday, Monday, July 15, 2019, "Lanza . . . redressed [her] for leaving early on Friday with a furious, hostile, and threatening profanity[-]laden tirade." (*Id*. ¶ 43). Lanza's response to Plaintiff's leaving early was "much more extensive" than anything she had ever seen Orozco "receive[] for his daily abuses of his coworkers . . . ." (*Id*. ¶ 45). Plaintiff tried to explain why she left early, but Lanza refused to listen to her explanation. (*Id*. ¶ 44). Upon returning to her desk, Plaintiff's anxiety was such that "her hands and knees [were] shaking from the stress of the . . . confrontation." (*Id*. ¶ 46). Plaintiff was, at this point:

> gravely concerned about her job . . . because she was not provided any mechanism by which to address[,] or people to speak with regarding[,] the conduct she endured, and . . . Lanza, who witnessed Orozco's outbursts, did nothing about them or . . . Lanza himself was the source of profanity[-]laden hostility toward her.

(*Id*. ¶ 47).

As for other interactions with the named Defendants, at some point after starting, although Plaintiff was not warned that she had to be familiar with an unspecified computer program, Lanza "criticized [her] in front of the entire staff [for] not knowing she had to use [the program] and . . . not knowing how to use it." (*Id*. ¶ 27). In another incident, when Plaintiff tried to make a presentation at a sales meeting, Lanza "talked over her and did not listen to her presentation." (*Id*. ¶ 28). Plaintiff complains that Lanza and Pagnozzi regularly had "daily screaming matches in the office . . . that sometimes seemed would escalate to physical violence." (*Id*. ¶ 30; *see also id*. ¶ 54).

Finally, Plaintiff alleges further that Phil Pinto ("Pinto"), the head of awning sales at Lanza Corp., was regularly abusive toward her and, when she did not understand him, he would yell, "Comprende?!" (*Id*. ¶ 64). Plaintiff insists that when Pinto instructed her to handle work orders a certain way—which included, *inter alia*, not writing "cash" on them—he did so in an effort to help Lanza avoid paying taxes. (*Id*. ¶ 65).

B.  Conduct Connected to Gender, Race, and/or Religion

Pagnozzi—described by Plaintiff as the "second in command" at Lanza Corp. and an owner of Adaptive Signage—along with unspecified "others" made "graphic, sexually explicit, and pornographic" jokes "in front of the entire staff . . . about their bodily functions, overweight people, and . . . Jewish people." (*Id*. ¶¶ 12, 51, 52). Plaintiff was "visibly uncomfortable" with this behavior. (*Id*. ¶ 53). The only way to "win points" at Lanza Corp. was, in Plaintiff's estimation, "to spew vile discriminatory comments and make [her] bosses laugh at these 'jokes.'" (*Id*. ¶ 62). Plaintiff maintains that the general "atmosphere of Lanza Corp. made it clear that discriminatory jokes were not only tolerated[,] but encouraged." (*Id*. ¶ 66).

i.   <u>Conduct Related to Jewish Faith and Ancestry</u>

Sometime in mid-to-late July 2019, Plaintiff learned about a former female employee who had sued Lanza Corp. (*Id*. ¶ 49). Lanza used anti-Semitic language when referring to this former employee, "calling her 'crazy Jew,' 'Jew bitch,' and other anti-Semitic slurs . . . ." (*Id*.). Plaintiff, hearing this, feared how Lanza would treat her "if he learned that she is Jewish and otherwise of Jewish heritage . . . ." (*Id*. ¶ 50). As a result of this fear, Plaintiff did not disclose her heritage or faith in the office. (*Id*.). Plaintiff avers that "Jewish clients were treated with hostility" by Lanza and Pagnozzi, and that somebody warned employees to "be careful" when dealing with Jewish clientele. (*Id*. ¶ 63). Pagnozzi, at some point, specifically referred to a prior Jewish employee as a "certain *type* of person," referring to the faith.[3] (*Id*. ¶ 60 (emphasis in original)).

On another occasion, a woman representing Young Israel of New Rochelle called Lanza Corp. (*Id*. ¶ 61). Plaintiff took the call and transferred it to Nick Contrata ("Contrata"), another employee. (*Id*.). According to Plaintiff, the caller sounded like she:

> might have been chewing gum or eating food. Contrata muted the phone and yelled out anti-Semitic comments about this "f[------] disgusting Jew bitch" with "no couth." Although those are the two specific comments [Plaintiff] remembers, there was more to the string of anti-Semitic comments . . . .

(*Id*.).

ii.   <u>Conduct Related to Gender</u>

Generally, Plaintiff alleges that Pagnozzi enjoyed standing at a window with male coworkers and "making sexually explicit comments about women who passed by on the sidewalk." (*Id*. ¶ 51). "Pagnozzi and his employees would laugh loudly at their comments and jokes, which were audible to the entire staff . . . ." (*Id*.). As for Lanza, Plaintiff says that he generally "had a

---

[3] It is unclear as to whether this former employee is the same one to which Lanza allegedly referred with anti-Semitic slurs.

habit of putting his arm around [Plaintiff's] shoulders or waist when speaking with her, even when he was criticizing her." (*Id*. ¶ 59). The physical contact made Plaintiff uncomfortable, but she did not raise the issue for fear of reprisal. (*Id*.).

At some point during Plaintiff's tenure, "Lanza Corp. attended a multi-day trade show." (*Id*. ¶ 58). While business cards had been ordered for Plaintiff "to pass out at the trade show," Lanza, before the trip, put his arm around Plaintiff's shoulder and told her that "she was no longer invited" because it was going to be a "boys' trip." (*Id*.). On another occasion, Box Car Cantina— a Lanza Corp. client—offered to treat all Lanza Corp. employees to lunch to celebrate a job's completion. (*Id*. ¶ 78). Neither Plaintiff nor Sue Bonchi ("Bonchi"), the officer manager, were allowed to attend the lunch; Lanza, in fact, told Plaintiff, "Stay here, this is a boys' lunch . . . pick up the phone." (*Id*. ¶¶ 70, 78).

At some other point during her employment, Lanza advised Plaintiff "that he could not fire Orozco, because Orozco had a family to support," but that she "could find a husband or boyfriend to rely on if things got tough." (*Id*. ¶ 76). Lanza stated further that Plaintiff "was an attractive girl" who "could . . . find someone if she needed to." (*Id*.). Plaintiff insists that Lanza "treated women as less capable than their male counterparts and viewed them as expendable because of his opinion that they could attach themselves to a man for support." (*Id*. ¶ 77).

Plaintiff, at some other point during her employment with Lanza Corp., spoke about "the repeated displays of hostility toward her with" Bonchi. (*Id*. ¶ 70). Bonchi, according to Plaintiff, "feared the wrath and hostility of the men in the office" and "frequently" advised that Plaintiff not "interfere with" or "complain about the men." (*Id*. ¶ 72). Indeed, Bonchi told Plaintiff, "Alex, men don't like to be told what to do. Stop telling them what to do if you want to keep your job." (*Id*. ¶ 71). Bonchi also warned Plaintiff that, if she decided to raise these concerns, "[T]hey will come

7

after you." (*Id.*). Whenever Plaintiff was subjected to hostility, "Bonchi would leave the room or lower her eyes to avoid similar treatment." (*Id.* ¶ 73).

With respect to clients, Plaintiff insists that female clients were generally "treated with hostility" and that on one unspecified occasion, a customer—described as a "female prison guard"—visited Lanza Corp. to discuss a sign she had ordered. (*Id.* ¶¶ 55, 63). This customer and Jaime "yelled at each other back and forth in the middle of the office." (*Id.* ¶ 55).

In addition to the foregoing behavior, Plaintiff reports that there was a sign posted on non-gendered bathroom in Lanza Corp.'s fabrication workroom and garage identifying the facility as a "tranny bathroom." (*Id.* ¶ 66).

III.   Plaintiff's Termination

Lanza fired Plaintiff in August 2019. (*Id.* ¶ 67). Lanza's initial explanation for the decision was that Plaintiff failed to order t-shirts for employees. (*Id.*). After Plaintiff reminded Lanza that it was Lanza, himself, who directed Plaintiff *not* to order the shirts, Lanza admitted "that he wanted to get rid of her before her medical benefits kicked in." (*Id.*). Plaintiff's medical benefits were, indeed, scheduled to begin "days" later. (*Id.* ¶ 68). Bonchi assured Plaintiff that "her work quality was not the reason for her termination," and Pagnozzi, at some point, told Plaintiff that "her professionalism was not in question and that she was 'a true professional.'" (*Id.* ¶¶ 69, 74).

This litigation followed.

## STANDARD OF REVIEW

I.   Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion enables a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). The factual allegations pled "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

"When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Thus, the Court must "take all well-ple[d] factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff[]." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). The presumption of truth, however, "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678 (alteration in original)). Therefore, a plaintiff must provide "more than labels and conclusions" to show entitlement to relief. *Twombly*, 550 U.S. at 555.

II. <u>Documents Considered on the Motion to Dismiss</u>

On a Rule 12(b)(6) motion, "the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014); *Manley v. Utzinger*, No. 10-CV-02210, 2011 WL 2947008, at *1 n.1 (S.D.N.Y. July 21, 2011) ("The Court may consider . . . documents incorporated into the complaint by

reference, and documents possessed by or known to the plaintiff and upon which plaintiff relied in bringing the suit."). Still, even if a document is not incorporated into the complaint by reference, the Court may consider it "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)); *see also Schafer v. Direct Energy Servs., LLC*, 845 F. App'x 81, 82 (2d Cir. 2021) ("Where an extrinsic document is not incorporated by reference, the district court may nevertheless consider it if the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotation marks omitted)).

The parties, in this case, have submitted a plethora of extraneous documents for the Court's review—more than two hundred fifty pages, in all—ranging from copies of the Complaint and Charges of Discrimination before the Equal Employment Opportunity Commission to copies of letters between counsel, the transcript of the pre-motion 30(b)(6) deposition, and copies of tax documents filed with New York State. (*See* Doc. 45; Doc. 48; Doc. 49; Doc. 50; Doc. 51; Doc. 54-1; Doc. 54-2; Doc. 55). No party has, however, explained specifically how the Court may consider any extraneous documents at this juncture: Defendants merely recite when the Court may consider documents outside the pleading on a motion to dismiss, and Plaintiff—citing a pre-*Iqbal* and *Twombly* standard—does not even address the issue. (*See* Def. Br. at 4-5; Opp. Br. at 6). The parties, although citing Federal Rule of Civil Procedure 12(b)(6), seem to blend standards and present arguments more properly made on a motion for summary judgment. Notwithstanding the parties' presentations, the Court cannot—and will not—wade into fact and credibility determinations on a motion to dismiss. The purpose of the early and targeted discovery Order from the Court was not to create an array of documents to be presented to the Court on a motion to

dismiss. Rather, the only purpose of the limited discovery permitted was to flesh out the status of the Corporate Defendants—collectively or any one of them—as an "employer" under Title VII, and to give Plaintiff an opportunity to amend her Complaint, should she desire, after that discovery was completed. The Court, therefore, declines to consider the extraneous documents submitted by counsel and limits its analysis to the Complaint.

## ANALYSIS

Generally, Title VII's objective is to ensure "that the workplace [is] an environment free of discrimination . . . ." *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009). The statute "makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-2(a)(1)). Title VII applies, however, only to entities meeting the statute's definition of "employer." *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 197 (2d Cir. 2005).

An employer, according to Title VII, is defined in pertinent part as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." 42 U.S.C. § 2000e(b). Plaintiff must, therefore, allege facts suggesting plausibly that at least one of the Corporate Defendants met this fifteen-employee threshold to state a claim under Title VII. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006) ("[W]e hold that the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue."); *Martin v. Performance Trans. Inc.*, 408 F. Supp. 3d 272, 275 (W.D.N.Y. 2019) ("That fifteen-employee threshold is a substantive element of a Title VII claim.").

Defendants argue that the Corporate Defendants never employed fifteen or more employees. (*See* Def. Br. at 5-7). Plaintiff, in opposition, argues that they did, in fact, employ the requisite number of employees and that, in any event, further discovery is required to resolve the question. (Opp. Br. at 6-11).[4] As discussed above, however, this a motion to dismiss, not a motion for summary judgment. The sole question before the Court is, therefore, whether Plaintiff pled plausibly—in accordance with *Iqbal*, *Twombly*, and their progeny—that one or more of the Corporate Defendants had the requisite number of employees.[5] The answer to that question is no.

First, looking to the face of the Complaint, Plaintiff does not allege—even in a single conclusory statement—that any one of the Corporate Defendants (or combination thereof) met Title VII's definition of employer. (*See generally* Compl.). Second, even if the Court disregards Plaintiff's failure to actually allege that the Corporate Defendants met Title VII's fifteen-employee threshold and looks to the substantive allegations, it cannot infer that any Corporate Defendant ever employed the requisite number of employees; indeed, Plaintiff identified only *eight* employees by name and provided no factual predicate to infer that others exist.[6] Dismissal of Plaintiff's Title VII claims is, therefore, appropriate, for failure to plead facts establishing that any one or more of the Corporate Defendants qualified as an employer under the statute. *See, e.g.*, *Lora v. Centralized Mgmt. Serv., Inc.*, No. 18-CV-04253, 2020 WL 3173025, at *3 (S.D.N.Y. June 12,

---

[4] Notably, Plaintiff alleges that Pagnozzi was an employer, but argues that he was actually an employee. (*Compare* Compl. ¶¶ 12, 51, *with* Opp. Br. at 6-8).

[5] The analysis concerns the Corporate Defendants because there is no individual liability under Title VII. *Wickes v. Westfair Elec. Co.*, No. 19-CV-10673, 2021 WL 217318, at *6 (S.D.N.Y. Jan. 20, 2021).

[6] Those employees identified are, in order of appearance: (1) Plaintiff; (2) Orozco; (3) Bryan; (4) Jamie; (5) Steve Melamed; (6) Contrata; (7) Pinto; and (8) Bonchi. (*See* Compl. ¶¶ 7, 29, 39, 42, 58, 61, 64, 70). Lanza and Pagnozzi are pled to be owners and, as Plaintiff concedes tacitly, owners are not employees. (*Id.* ¶¶ 11-12; Opp. Br. at 8 ("Plaintiff understands that Lanza is most likely an employer. However, Defendants have provided no evidence in support of their contention that Pagnozzi should be considered an employer . . . .")). Still, even if the Court included Pagnozzi *and* Lanza in its tally, the total only reaches *ten* individuals.

2020) (dismissing Title VII claims where the plaintiff failed to plead "details—conclusory or otherwise—as to the number of employees" and the Court could not infer whether defendants met "the requisite threshold number of employees for an employer under Title VII"); *Vera v. Donado Law Firm*, No. 17-CV-03123, 2019 WL 3306117, at *6 (S.D.N.Y. June 19, 2019) (denying motion for default judgment under Title VII because, *inter alia*, the plaintiff did not plead that the defendant "had at least 15 employees"), *adopted by* 2019 WL 3302607 (S.D.N.Y. July 23, 2019); *Eyeghe v. Thierry*, No. 14-CV-01914, 2014 WL 5242605, at *1 (S.D.N.Y. Oct. 15, 2014) (dismissing Title VII claim where the court found "a complete failure to allege, even in conclusory fashion, that [the defendant] qualifies as an employer for Title VII purposes").

Having dismissed Plaintiff's Title VII claims for relief—i.e., the only claims over which this Court has original jurisdiction—the only claims remaining for consideration are those Plaintiff intends to press under New York State and New York City law. (*See* Compl. ¶¶ 3, 100-70). The Court, therefore, declines to exercise jurisdiction over any outstanding state law claims. *See McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 158 n.6 (2d Cir. 2017) ("Of course, a district court may decline to exercise supplemental jurisdiction over state and local law claims if it has dismissed all claims over which it has original jurisdiction."); *Offor v. Mercy Med. Ctr.*, No. 17-CV-01872, 2018 WL 2947971, at *7 (S.D.N.Y. May 31, 2018) ("A federal district court may decline to exercise supplemental jurisdiction over pendent state law claims when it 'has dismissed all claims over which it has original jurisdiction.'" (quoting 28 U.S.C. § 1367(c)(3))); *see also Williams v. Novoa*, No. 19-CV-11545, 2022 WL 161479, at *12 (S.D.N.Y. Jan. 18, 2022); *Ventillo v. Falco*, No. 19-CV-03664, 2020 WL 7496294, at *14 (S.D.N.Y. Dec. 18, 2020); *Eyeghe*, 2014 WL 5242605, at *2 (declining to exercise supplemental jurisdiction over state law claims after dismissing Title VII claim for failure to allege plausibly the requisite number of employees).

13

Any state and local law claims Plaintiff wishes to press are, accordingly, dismissed without prejudice to re-filing in the proper forum. The Court expresses no opinion as to the viability of those claims.

**CONCLUSION**

For the reasons outlined above, Defendants' motion to dismiss is GRANTED with prejudice as to Plaintiff's claims under Title VII and without prejudice to re-filing in the proper forum as to Plaintiff's claims under New York State and New York City law.

The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 44 and close this case.

**SO ORDERED:**

Dated:   White Plains, New York
         February 28, 2022

_____
PHILIP M. HALPERN
United States District Judge

14